Filed 3/3/21; modified and certified for publication 3/23/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| ALPHA NU ASSOCIATION OF THETA XI, | B303269 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 18STCP02516) |
| v. |  |
| UNIVERSITY OF SOUTHERN CALIFORNIA et al., |  |
| Defendants and Respondents. |  |

APPEAL from a judgment of the Superior Court of
Los Angeles County, Mitchell L. Beckloff , Judge.  Affirmed.
Hathaway Parker, Mark M. Hathaway and Jenna E.
Parker for Plaintiff and Appellant.

Paul Hastings, J. Al Latham, Jr., Paul W. Cane, Jr. and Cameron W. Fox for Defendants and Respondents.

---

### INTRODUCTION

Appellant Alpha Nu Association of Theta Xi (Theta Xi), a national fraternity, challenges the decision by respondent University of Southern California (USC) to suspend recognition of Theta Xi's USC chapter for six years. In January 2018, in response to a complaint submitted that month by former Theta Xi member John Schaar, USC's Office of Student Judicial Affairs and Community Standards (SJACS) began investigating allegations that Theta Xi had hazed new members in fall 2016 and fall 2017, and had served alcohol at recruitment events. The investigation was conducted by respondent Donna Budar-Turner (SJACS's director) and another investigator. SJACS interviewed Schaar and four Theta Xi members, and received documentary evidence from both Schaar and Theta Xi.

SJACS ultimately found that in fall 2016 and fall 2017, Theta Xi's active members expected and at times required underage pledges to participate in drinking games designed to induce severe inebriation, subjected pledges to requirements likely to compromise their dignity and deprive them of sleep, and encouraged pledges to fight other members as a spectator sport. Specifically, SJACS found that during a brotherhood retreat, pledges were required to participate in an "Around the World" event featuring at least five varieties of alcoholic beverages, during which pledges

were encouraged to drink in large quantities, and some members fell ill. Within the Theta Xi house, pledges played Power Hour (each participant drank a shot of beer every minute for an hour), War (each team drank 60 cups of beer and Four Loko as fast as possible), and the Great American Challenge (each team raced to consume a 30-pack of beer, in addition to pizza and marijuana). Throughout their initiation week, all 11 members of the 2016 pledge class were required to sleep in the Theta Xi house's small library, which was not large enough to accommodate them, and to clean the library to the active members' satisfaction if they wished to sleep undisturbed. At the same time, pledges wore costumes of cartoon and comic book characters at the request of active members. Moreover, pledges participated in annual "fight night" events, during which members fought other members with whom they had a dispute, watched by an audience of members and others -- at times resulting in noise complaints. On the basis of these findings, SJACS concluded that Theta Xi had violated nine sections of the University Student Conduct Code (USC Code), including sections prohibiting hazing and the serving of alcohol to anyone under 21. SJACS determined that the appropriate sanction was a six-year suspension of USC's recognition of the local Theta Xi chapter.

Theta Xi appealed the suspension to USC's Student Behavior Appeals Panel (SBAP). Theta Xi acknowledged the truth of several of SJACS's findings, including the findings that pledges had participated in "fight night" and been

3

invited by active members to drink alcohol, but argued the underlying activities were voluntary and therefore did not warrant sanctions. Theta Xi also characterized several of the underlying activities as innocuous; for instance, it characterized "fight night" as a boxing lesson held in the spirit of healthy dispute resolution, and compared Power Hour and the Great American Challenge to hypothetical games of Monopoly and backgammon. In responding to and rejecting the appeal, respectively, SJACS and SBAP emphasized that Theta Xi had violated USC rules regarding hazing and alcohol. They also observed that Theta Xi had failed to evaluate its culture or to take responsibility for its members' actions, and that the six-year suspension would incentivize Theta Xi to make changes to its culture and leadership before seeking to resume activities as a USC student organization. The suspension became final when SBAP's decision was approved by respondent Ainsley Carry, then USC's vice president for student affairs.

Theta Xi filed a petition for a writ of administrative mandamus against USC, Budar-Turner, and Carry under Code of Civil Procedure section 1094.5. Theta Xi alleged that USC's suspension decision should be set aside because USC's administrative procedure had been unfair, and because SJACS's factual findings were not supported by the evidence. Rejecting both allegations, the trial court denied the petition.

On appeal, Theta Xi contends (1) USC acted in excess of its jurisdiction by suspending its recognition of Theta Xi's

4

USC chapter based on events that preceded Schaar's complaint by more than one year; (2) SJACS's factual findings were unsupported by the evidence; (3) USC's decision was unsupported by SJACS's factual findings; and (4) USC's administrative procedure was unfair.

Finding no error, we affirm.

## FACTUAL BACKGROUND
### A. *USC's Administrative Investigation*
#### 1. *Schaar's History with Theta Xi*

Theta Xi, a national fraternity, has long operated a chapter at USC, in addition to chapters at other universities. Theta Xi owns a house near the USC campus, and rents rooms in it to members and non-members. Events held to recruit new members are known as "rush" events. Rush events held without university approval -- including all rush events involving alcohol -- are known as "dirty" rush events. Newly admitted members are referred to as "associate members" or "pledges." Pledges are required to undergo an initiation process before becoming "active" members. The week before their initiation into active status is known as initiation week or "hell week."

In fall 2016, John Schaar was one of 11 pledges at Theta Xi's USC chapter. His girlfriend, Sarah Nuckel, was a tenant in the Theta Xi house. After an initiation week in October 2016, he became an active member. In 2017, disputes arose between Theta Xi, on the one hand, and Schaar, Nuckel, and Schaar's mother, on the other. These

disputes related to (1) allegations that Schaar had sexually harassed and sexually assaulted women; (2) Schaar's desire to renounce his Theta Xi membership in order to join another fraternity; and (3) Theta Xi's attempts to collect unpaid rent from Nuckel after she moved out of the Theta Xi house before the end of her lease.

In the course of these disputes, Schaar's mother left a voicemail for the director of chapter services at Theta Xi's headquarters in Missouri, alleging that Theta Xi had hazed Schaar and forced him to drink alcohol, and threatening to "'tell[] the whole story'" to USC's administration. Additionally, in text messages to the USC chapter's president (Jose Casillas) and house manager (Michael Marzouk), Schaar predicted that Theta Xi would soon hear from SJACS, and that Theta Xi would "lose," "get fucked," or be "kicked off campus."

## 2. *Schaar's Complaint*

On January 10, 2018, SJACS received a written complaint from Schaar concerning his experiences as a Theta Xi pledge in fall 2016.[1] Schaar alleged he and other pledges had "endured a number of different hazing incidents . . . ." First, the pledges had participated in "[l]ots of forced

---

[1] Schaar's complaint was submitted about 14 months after his experiences as a pledge. The USC Code provides, "Generally, a matter will be reviewed only when a report has been filed with [SJACS] within one year of discovery of the alleged violation."

drinking activities," including the Great American Challenge (which was later described by Schaar and active Theta Xi members as a game in which competing teams each consume a 30-pack of beer, in addition to pizza and marijuana). Second, on the first morning of hell week, the pledges were awakened at 5:00 a.m., forced to drink alcohol, and required to run laps, during which one pledge fell and "cut his knee very bad." Third, active members blindfolded Schaar, confiscated his phone and wallet, and dropped him off (while he was wearing only a "morph suit") at the University of California, Los Angeles (UCLA), where he and other pledges were told to complete tasks and find their way back to USC. Fourth, Theta Xi held a "fight night" event, during which active members required pledges "to drink copious amount[s] of alcohol and . . . fight each other while actives watched." Finally, for 10 days (including hell week), the active members required all 11 pledges to sleep in the Theta Xi house's small library, which was not large enough to accommodate them. During that 10-day period, "[s]everal [pledges] got sick because of lack of sleep and the gross conditions of the room."

Schaar alleged that Jose Casillas and Damian Ortega had been the active members "in charge of hazing," and that the specified incidents could be corroborated by witnesses and "group messages." He submitted screenshots of several group text messages sent by active Theta Xi members. Messages from late October 2016 implied that pledges were

then required to sleep in the Theta Xi house's library.[2] Messages from January 2017 indicated that Theta Xi was then hosting rush events at which potential members participated in drinking games.[3]

Along with Schaar's complaint, SJACS received a statement from Schaar's girlfriend, Sarah Nuckel. She alleged that after Schaar left Theta Xi, its members had launched a "smear campaign" against him, repeatedly lying to her and her friends that Schaar had embezzled money and

[2] On October 27, 2016, Theta Xi member Peter Chen wrote, "The ass mems [associate members] are at the house from 6pm-6am[.]" The next day, Theta Xi member Derek Cheng wrote, "[T]he AM [associate member] group . . . will need to keep that room clean if they want to sleep undisturbed for the rest of I-week[.]" Chen responded, "I assigned two AMs, who stayed sober all of last night, to be in charge of cleaning the library after the I-week event. They did not complete their job. This won't happen again."

[3] On January 11, 2017, Theta Xi member Andrew Weilbacker wrote, "[W]e will be having a Brotherhood/Dirty Rush Beer Pong Tournament tonight at the house. We will have a few potential members hanging out with us . . . ." Theta Xi member Anish Mahadeo inquired, "[W]ill we be doing beer p[o]ng tomorrow as well?" Weilbacker responded, "I was thinking possibly a power hour[.]" The next day, Weilbacker wrote, "[W]e will be inviting rushees . . . to the house tonight. Probably power hour and/or rage cage." Schaar and active Theta Xi members later confirmed that Power Hour and Rage Cage are drinking games. Power Hour entails drinking one "shot of beer" per minute for an hour. Rage Cage involves drinking alcohol from and bouncing balls into cups arranged on a table.

8

committed "Title 9 offenses."  Nuckel's statement said nothing related to Schaar's allegations against Theta Xi.[4]

### 3. *Notice of Schaar's Complaint and Interim Suspension*

On January 17, 2018, SJACS emailed a letter to Theta Xi President Jose Casillas, notifying Theta Xi that SJACS had received a complaint from a student that Theta Xi had violated the USC Code.[5]  For reasons the record does not disclose, the notice letter identified the "Date(s) of Incident(s)" as November 4, 2017 (roughly a year after Schaar had been initiated into active status).  As a "Description" of the complaint, the letter stated, "Hazing[.]" It did not identify Schaar or describe the substance of his allegations.

The notice letter alleged violations of nine sections of the USC Code, including one section concerning unauthorized dissemination of alcohol, two sections concerning risks to health or safety, two sections concerning disruptive behavior, and four sections concerning violations

---

[4]     SJACS emailed an interview request to Nuckel.  There is no evidence in the record that Nuckel responded to the request, or that SJACS made further efforts to interview her.

[5]     The USC Code requires SJACS to provide an investigation respondent with "[w]ritten notice via email of the incident report that specifies the nature of the alleged violation and the basis for the charge including the date or period of time and location regarding the alleged incident."

9

of other university rules.[6]  One of the latter four sections specifically concerned violations of USC Code section G.2, which provided, "Student organizations may be held responsible for the acts of individual members.  Acts include but are not limited to the following types of circumstances: [¶] when a member of an organization is violating state law

---

[6]     Specifically, the notice letter alleged violations of the following sections of the USC Code:  (1) section 11.40, prohibiting "[u]nauthorized use, possession or dissemination of alcohol or tobacco products in the university community or at university-sponsored activities"; (2) section 11.32.A, prohibiting "[c]onducting oneself in a manner that endangers the health or safety of oneself within the university community"; (3) section 11.36.B, prohibiting "[c]ausing reasonable apprehension of harm to any person in the university community"; (4) section 11.38, prohibiting "[b]ehavior which disrupts or interferes with normal university or university-sponsored activities, including, but not limited to, study, teaching, research, officially invited speakers, university administration, public safety, or fire, police or emergency services or other authorized activity"; (5) section 11.44.A, prohibiting "[e]ngaging in disruptive or disorderly conduct in the university community"; (6) section 11.44.C, prohibiting "[e]ncouraging or permitting others to engage in misconduct prohibited within the university community, [or] failing to confront and prevent the misconduct, notify an appropriate university official of the misconduct, or remove oneself from the situation"; (7) section 11.50.B, prohibiting "[v]iolating standards or policies established for social Greek letter organizations"; (8) section 11.50.C, prohibiting "[v]iolating any policies, rules or regulations of the university"; and (9) section 11.50.D, prohibiting "[v]iolating Section G.2. Group Responsibility for Student Organizations . . . ."

or university standards and other members present fail to indicate their disapproval, or by their continued presence without objection implicitly condone the behavior; [¶] . . . [¶] . . . [¶] when an organization places prospective members in a subordinate status prior to achieving full membership, or imposes any kind of probationary period prior to full membership, and hazing occurs." As examples of relevant university rules, section G.2 identified, inter alia, rules regarding alcohol and hazing.[7]

---

[7] USC's alcohol policies prohibited, inter alia, (1) providing alcohol to any person under the age of 21; (2) serving alcohol "to the point of intoxication" or "to an intoxicated person"; and (3) serving alcohol without university permission at a student organization's event.

USC's hazing policy provided, inter alia, "[T]he university's policy with respect to hazing prohibits students from engaging collectively or individually in any of the following practices as a part of any programs or general activities. This list is intended to provide examples of hazing; as it is impossible to anticipate every situation that could be defined as hazing, this list should not be considered all-inclusive. [¶] a. Forced excessive or strenuous physical activities. [¶] b. The application of foreign substances to the body. [¶] c. Activities such as scavenger hunts, which result in illegal or otherwise prohibited activity, such as pledge ditches, kidnaps and the like. [¶] d. Depriving students of sufficient sleep (eight consecutive hours per day minimum). [¶] e. Not providing decent and edible meals (no unusual combinations or preparation, colored foods, etc.). [¶] f. Depriving students means of maintaining a normal schedule of bodily cleanliness (including a minimum of one shower per day). [¶] g. Depriving students means of communications, such as their cell phones. [¶] h.
*(Fn. is continued on the next page.)*

11

The day after it sent the notice letter (on January 18, 2018), SJACS sent an email to USC's associate vice provost for student affairs, requesting an interim suspension of USC's recognition of the local Theta Xi chapter.  SJACS described Schaar's allegations, which it characterized as "allegations of hazing," and noted that Theta Xi members' text messages seemed to corroborate some of the allegations. Later that day, the associate vice provost for student affairs sent a letter to Casillas, notifying Theta Xi that an interim suspension had been placed on Theta Xi "pending the review of reports of alleged behaviors that may have endangered the university community, including hazing."

### 4. *Schaar's Interview*

On January 19, 2018, two days after SJACS sent the notice letter, Schaar was interviewed by SJACS Director Donna Budar-Turner and SJACS Judicial Officer Lucy

---

Forcing, coercing or permitting students to eat an excess of substances such as raw meat, onions, peppers, etc. [¶] i. Forcing, coercing, or permitting students to drink excessive amounts of liquids including alcohol, salt water, water, etc. [¶] j. Nudity or forcing or allowing students to dress in a degrading manner. [¶] k. Branding any part of the body. [¶] l. Psychological hazing, which is defined as any act or peer pressure which is likely to: (i) compromise the dignity of any student affiliated with the organization, (ii) cause embarrassment or shame to any student affiliated with the organization, (iii) cause any student affiliated with the organization to be the object of malicious amusement or ridicule, or (iv) cause psychological harm or emotional strain."

Chavez Vargas.  As set forth below, Schaar generally repeated and elaborated on his written allegations.

Schaar alleged that in fall 2016, pledges had been required to participate in several drinking games, including Power Hour.  A couple of pledges had vomited while playing Power Hour.  Pledges also had played War, in which a team of four or five pledges drank approximately 60 cups of beer or Four Loko.  While playing War, one pledge (Nikhil Cherukuri) had become so intoxicated that he showered with his clothes on and vomited multiple times.  Pledges had also been required to drink "'a lot'" of alcohol during a retreat held in a rented house in San Diego.  The retreat had featured an "Around the World" event, during which approximately nine rooms had been set up to feature alcoholic drinks representing different nations, including tequila, wine, sake, "Irish car bomb" cocktails, and Jägermeister.  Pledges had spent approximately five minutes in each room.  Several pledges had vomited during the event, and one (Anish Mahadeo) had passed out.

During hell week, pledges had been required to spend each evening and night at the Theta Xi house, and to sleep in the library.  Pledges had also been asked to wear "ridiculous" costumes, including of cartoon and comic book characters (Naruto and Spider-Man).  One morning, the pledges had been awakened at 5:00 a.m., and required to drink alcohol before running laps, during which one pledge (Oliver Eisenberg) fell and cut his knee.  Schaar predicted that Eisenberg might corroborate his allegations.

Also during hell week, active members had blindfolded pledges, confiscated their phones and wallets, and dropped them off at UCLA, where they were tasked with, inter alia, finding the UCLA chapter of Theta Xi and finding their way back to USC. The pledges had returned to USC in a car that one pledge retrieved from his home near UCLA. Pledges had also been required to visit the Theta Xi chapter at the University of California, Davis, where the Davis members threw eggs at them and gave them alcohol.

Finally, during a "fight night" event, active members had required pledges to fight each other (while wearing boxing gloves).[8] Schaar had fought fellow pledge Nikhil Cherukuri, and knocked him down. Several pledges had sustained bruises, and another had sustained a black eye.

### 5. *Casillas's Interview*

At the time of the SJACS investigation, Jose Casillas was president of Theta Xi's USC chapter. On January 19, 2018, two days after Casillas received the notice letter, Budar-Turner and Chavez Vargas interviewed Casillas, who was accompanied by Theta Xi Vice President Nicholas Toghia. According to Chavez Vargas's interview notes, Budar-Turner "explained [the] allegations" and read "the

---

[8] Though Schaar's written complaint alleged that pledges had been required to drink alcohol during "fight night," he stated otherwise during his interview.

14

report" to Casillas, and both Casillas and Toghia viewed the text messages Schaar had submitted with his complaint.[9]

In the interview, Casillas, who had been the "pledge master" or "associate member educator" in fall 2016, addressed each specific allegation in Schaar's written complaint. He acknowledged that "usually" all pledges "end up" sleeping in the Theta Xi house during initiation week, and that the library is set up for them to sleep in. But he denied that pledges were required to sleep in the library, or at the house. He further acknowledged that Theta Xi hosted a "fight night" in which pledges "who ha[d] a dispute with each other" were allowed to participate, although he emphasized that participation was not mandatory. He indicated that a goal of the event was to "'let out the steam[.]'" He confirmed that the fall 2016 pledges had been awakened early one morning, and that Eisenberg had fallen and cut his knee, although he denied any knowledge of mandatory running. Finally, he confirmed that pledges had been tasked with visiting Theta Xi's UCLA chapter, taking a

---

[9] In a January 27, 2018 letter to Budar-Turner, Toghia characterized Casillas's interview as a "grueling 2-hour long interrogation" and complained, "At the end we still didn't know the specifics of the charges and when I asked you to provide them you declined and said they were 'confidential.'" Two days later, in an email to Toghia and others, Casillas memorialized other complaints about the interview, including a claim that he had been "given no time to give any clarification or tell [his] side of the story . . . ." Casillas accurately identified Schaar as the source of the administrative complaint.

15

photo, and posting it to a group chat. He did not corroborate any of Schaar's other allegations about the UCLA event.

Casillas also addressed Schaar's allegations concerning alcohol. He acknowledged that pledges were allowed to participate in the Great American Challenge drinking game, although he claimed they usually did not. He further acknowledged that pledges and other members, including at least one 18-year-old member, had drunk alcohol during the Around the World event, although he claimed drinking had been optional. He recalled a few active members vomiting during the event, but claimed he did not remember any pledges falling ill. He denied that Theta Xi served alcohol at any rush events.

### 6. *Other Theta Xi Members' Interviews*

Within days of its interview of Casillas, SJACS emailed interview requests to Theta Xi members Andrew Weilbacker, Damian Ortega, and Oliver Eisenberg. On January 25, 2018, in response to Eisenberg's refusal to attend an interview without an attorney present, SJACS "placed a hold on Mr. Eisenberg's record for failure to comply with a request to meet with SJACS." Eisenberg ultimately consented to an interview without an attorney.

On January 26, 2018, Budar-Turner and Chavez Vargas interviewed Andrew Weilbacker, who had been a member of the fall 2016 pledge class. They denied Weilbacker's request to be accompanied by Theta Xi Vice President Toghia during the interview. Weilbacker stated

16

that during the fall 2016 pledging process, he had slept in the Theta Xi house's library for four or five days. He further stated that he had fought fellow pledge Matt Anderson during the "fight night" event, and confirmed that Schaar had fought fellow pledge Cherukuri. He stated that participants had worn gloves, headgear, and mouthpieces, and that an alumnus with relevant experience had served as a referee. He recalled that campus police had arrived during the event and told the members to "keep the noise down." Weilbacker denied that he had ever felt pressured to do anything as a pledge. He confirmed that the pledges had been awakened early to run laps, but denied alcohol was involved. He confirmed that alcohol generally had been available to pledges. When shown his January 2017 text messages referring to rush events featuring drinking games, he responded, "[A]ll fraternities do this[.]"

On April 4, 2018, Budar-Turner and Chavez Vargas interviewed Damian Ortega, who had been the "assistant pledge master" (or "assistant associate member educator") in fall 2016. Ortega confirmed that pledges had fought other pledges and active members during the "fight night" event, with the safety precautions Weilbacker had described. He indicated some of the members who fought each other had "'beef'" (disputes). He further confirmed that active members had told pledges they should sleep in the Theta Xi house, and that the library was the "main" space in which the pledges had slept. Pledges had been responsible for keeping the library clean because they had been "residing" in

17

it, and they had been told they would be woken up early if they did not keep it clean. He acknowledged "there may have been a couple of wake ups," but stated he did not believe there had been. He further acknowledged that pledges had been dropped off at UCLA and tasked with "finding" the UCLA Theta Xi chapter. He stated that the Great American Challenge drinking game was "usually" played in teams of "actives vs associates," though it had been played in "mixed" teams in fall 2017. He indicated the Power Hour drinking game was designed "'to get drunk,'" although he claimed he had never participated. Finally, he stated that in fall 2017, he had occasionally led the pledge class in workouts, including workouts at a park near the Theta Xi house. In her interview notes, Chavez Vargas wrote "holding 25lb plate" and "'we would all carry equipment to the park[.]'" Ortega denied that pledges had been required to sleep in the library or to participate in the Great American Challenge, fight night, or workouts.

On April 13, 2018, Chavez Vargas interviewed Oliver Eisenberg, who had been a member of the fall 2016 pledge class. Eisenberg confirmed that he had scraped his knee during a run, but stated that the injury had not required medical attention, and that he had not been under the influence of alcohol at the time. He acknowledged that he had drunk alcohol as a pledge, including while participating in the Great American Challenge and the Around the World event. He further acknowledged that the pledges had been told to sleep in the library during initiation week, and that

18

most complied.  He denied that he had been forced to do anything, maintaining that all pledge activities had been voluntary.

### 7. *Theta Xi's Internal Investigation*

On March 26, 2018, Theta Xi interviewed 16 active members, seven of whom had been members of the fall 2016 pledge class.  The questions and answers from each interview were recorded on a single-page questionnaire.  The questions were derived from USC's hazing policy; specifically, each question corresponded to one of the policy's non-exhaustive examples of forbidden hazing practices.  Members who had been pledges in fall 2016 (including Weilbacker and Eisenberg) were asked if they had been subjected to any of those hazing practices, while members who had been active in fall 2016 (including Casillas and Ortega) were asked if they had subjected Schaar to any of those hazing practices.  Each member answered "No" to every question.

Also on March 26, 2018, Toghia sent a letter to USC's senior vice president and general counsel, informing her that Theta Xi had interviewed its members and found no hazing or misconduct, and that it had additionally scheduled "interrogation[s] under oath" of its members to take place in April 2018.  Toghia invited the general counsel to participate in the upcoming interviews under oath, predicting she would "reach the same conclusion that none of the conduct prohibited by [USC's hazing policy] occurred."  On April 5,

2018, USC's university counsel sent a response letter to Toghia, observing that Theta Xi and other outside entities had no role to play in conducting SJACS's investigation, but that "relevant information is always welcome."

On April 7, 2018, Theta Xi conducted interviews under oath, transcribed by a court reporter, of 14 of its members (including Weilbacker, Ortega, and Eisenberg), eight of whom had been pledges in fall 2016. No USC representative attended the interviews. Again, each member was asked questions derived from USC's hazing policy, and each indicated he had not been subjected to, and had not subjected Schaar to, any of the policy's non-exhaustive examples of forbidden hazing practices. Nearly all the members were also asked to share their opinions of Schaar. Most members opined that Schaar was a misogynist, and recalled various verbal transgressions he had committed against women.

The interviews under oath were conducted by Toghia, who had been present during SJACS's interview with Casillas. Generally, Toghia did not ask the Theta Xi members about the specific incidents Casillas had addressed during his interview.[10] For instance, Toghia did not ask

---

[10] Toghia did ask some members about "fight night" and the UCLA event. Two members acknowledged they had participated in "fight night," but emphasized they had done so voluntarily, and two others stated they had not participated. Several members acknowledged that pledges had been dropped off near UCLA and asked to find Theta Xi's UCLA chapter, and that the

*(Fn. is continued on the next page.)*

Eisenberg about the incident in which he had fallen and cut his knee. Nor did he ask any members whether pledges had drunk alcohol during the Great American Challenge or the Around the World event. With the exception of Ortega, none of the members were asked whether pledges had been required to sleep in the Theta Xi house's library during initiation week (Ortega claimed that pledges had been allowed to sleep at their own homes, and that those who had slept at the Theta Xi house were not confined to the library).

Though Theta Xi member Chris Ladan had executed a questionnaire, he was not interviewed under oath. On August 19, 2017, when he was 20 years old, Ladan had been found "heavily intoxicated" near the Theta Xi house by a USC Department of Public Safety officer (according to the officer's incident report, which SJACS incorporated into the administrative record). Ladan was sitting on a curb, attempting to stand, and vomiting. Ladan's speech was slurred, and he was unable to answer some questions about himself and his whereabouts. Before he was transported to a hospital, however, Ladan told the officer he had been drinking at his fraternity house.

---

pledges returned in a car that one pledge retrieved from his home near UCLA. They denied that pledges had been blindfolded or deprived of phones or wallets.

21

### 8. *Theta Xi's Evidence Review and Additional Submissions*

On April 16, 2018, Toghia emailed Budar-Turner and other USC administrators, attaching the transcripts of the 14 interviews under oath. Toghia requested that USC rescind its interim suspension of its recognition of the local Theta Xi chapter, on the ground that the transcripts made clear that no violation of USC's hazing policy had occurred. Toghia also observed that the members' characterizations of Schaar "portray[ed] a person who behaved in the most offensive manner toward women and whose self-expressed attitudes show objective hostility toward women."

The same day, Chavez Vargas emailed Theta Xi president Casillas. She informed Casillas that SJACS's investigation was nearly complete, and invited him to submit additional information or schedule a meeting to review the information that SJACS had gathered.

On May 9, 2018, Chavez Vargas and Budar-Turner met with Casillas, who was accompanied by attorney Mark Hathaway (his counsel in the trial court and on appeal). Chavez Vargas read a summary of the information gathered in SJACS's interviews. She allowed Casillas and Hathaway to review Schaar's written complaint, the text messages Schaar had submitted, and SJACS's notes from its witness interviews. Their review of the evidence lasted approximately 50 minutes.

After reviewing the evidence, Casillas said that "'a few things'" stated in the evidence were incorrect. The record

does not disclose whether Casillas specified any alleged inaccuracies. Casillas was invited to provide additional information. Casillas said there was "'not much'" he could add, but indicated he would submit additional documents.

On May 11, 2018, Casillas emailed Chavez Vargas and attached various documents, which he characterized as "all the relevant information that we would like to turn in for our case." The documents included, inter alia, the questionnaires and transcripts collected in Theta Xi's internal investigation, and records of Schaar's disputes with Theta Xi and alleged transgressions against women.

## B. *USC's Administrative Decision*
### 1. *SJACS's Decision*

On August 9, 2018, SJACS sent Theta Xi a Summary Administrative Review (SAR) report notifying Theta Xi of SJACS's decision to suspend the USC chapter's recognition as a student organization for six years.[11] By a preponderance of the evidence, SJACS found that Theta Xi

---

[11] USC Code section 11.93, entitled "Organizational Sanctions," provides, "All organizations . . . are responsible for compliance with university rules and regulations. Upon a determination that the group has engaged in violations, encouraged violations, or did not take reasonable steps as a group to prevent violations of university rules and regulations, the group may be subjected to permanent or temporary removal of recognition . . . ." Within its hazing policy, the USC Code similarly provides that a student organization may lose its recognition if SJACS finds a hazing violation.

was responsible for violations of each section of the USC Code listed in the notice letter. In a five-page "Rationale" section of the SAR report, SJACS summarized Schaar's allegations at length, and observed that most were corroborated by Theta Xi members' text messages and interview statements. It proceeded to set forth the following factual findings.

SJACS found widespread and frequently excessive drinking at Theta Xi events, including among underage pledges. It found Schaar's allegations corroborated, in part, by a message sent by active member Peter Chen during the fall 2016 initiation week, in which he observed he had assigned library-cleaning duties to two pledges who had "stayed sober" the previous night (suggesting intoxication among most or all of the other pledges). SJACS further found that active members had "planned and executed drinking games for the new member class to participate in," including the Great American Challenge (each team raced to consume a 30-pack of beer, in addition to pizza and marijuana), War (each team drank 60 cups of beer and Four Loko "as fast as possible"), and Power Hour (each participant drank a shot of beer every minute for an hour). Similarly, SJACS observed that a Theta Xi member (Weilbacker) had sent text messages planning to play Power Hour and/or other drinking games at rush events, that Theta Xi members had been aware of the prohibition against serving alcohol at rush events, and that Weilbacker had nevertheless commented, "[A]ll fraternities do this." Finally, SJACS

24

found that active members had required pledges to participate in the Around the World event featuring at least five varieties of alcoholic beverages (tequila, wine, sake, cocktails known as "Irish car bombs," and Jägermeister), during which pledges had been "provided and encouraged to consume large amounts of alcohol," and members had fallen ill.

Moreover, and related to Chen's message regarding the two sober pledges assigned to clean the library, SJACS found that the 11 members of the fall 2016 pledge class had been required to sleep in the Theta Xi house's library during initiation week. It further found, "New members were told that if they did not keep the library clean, they would be woken up by active members at early hours of the morning. The assistant pledge master [Ortega] stated that 'there may have been a couple of wake ups.' . . . Some of the new members slept on the floor. . . . New members were asked to wear costumes during this time. It was reported that one member wore a Naruto costume and another wore a Spiderman costume." In finding that Chen's message corroborated Schaar's allegations, SJACS quoted Chen's observation that the two sober pledges had not completed their library-cleaning job, and his announcement, "'This won't happen again.'"

SJACS also found that Theta Xi had hosted "fight night" in fall 2016 and fall 2017. While active members and others watched, pledges (as well as active members) "fought someone in the chapter who they had 'beef' (a dispute) with.

25

It was reported that the purpose of this activity was to 'let out steam' and settle conflict with each other." SJACS did not find that participation had been mandatory, or that anyone had been injured (although it noted Schaar's allegations that "at least one new member was 'knocked over,' another had a black eye and others had bruises from the punches"). It did find that campus police had "responded to noise complaints resulting from fight night."

SJACS made several other findings. First, it found, as Schaar alleged, that the fall 2016 pledge class had been awakened early one morning for a mandatory run, during which Eisenberg fell and cut his knee. Relatedly, it found, "[n]ew members of the Fall 2017 class engaged in physical activities similar to what occurred in Fall 2016. . . . New members participated in workouts led by the pledge master [Ortega] and at times had to carry 25lb weights from the Theta Xi house to [a nearby] park . . . ." Finally, SJACS found, as Schaar alleged, that active members had dropped the 2016 pledge class members off at UCLA and tasked them with finding Theta Xi's UCLA chapter and then finding their way back to USC.[12]

In addition to setting forth factual findings, the "Rationale" section of the SAR report addressed Theta Xi's

---

[12] SJACS observed that it had received "conflicting reports" regarding whether active members had blindfolded the pledges or confiscated their phones or wallets during the UCLA event. It did not resolve the conflict between those reports.

submissions.  SJACS observed that during Theta Xi's internal interviews, its members had not been asked about the incidents that had been brought to Theta Xi's attention earlier.  It further observed that the members had been asked if they had been "'forced'" to engage in certain acts, and Theta Xi had taken the position that pledges had not been "forced" to do so.  SJACS commented, "Force is not necessarily an indication of hazing.  New members often engage in hazing activities voluntarily, as a result of peer pressure, intimidation or their desire to be a part of an organization."

## 2. *Theta Xi's Administrative Appeal*

The SAR report notified Theta Xi of its right under the USC Code to appeal SJACS's decision to SBAP.  The Code authorized appeals only on the following grounds:  (1) "new evidence has become available which is sufficient to alter the decision and which the appellant was not aware of or could not have been reasonably obtained at the time of the original review"; (2) "the sanction imposed is excessive, insufficient or inappropriate"; and (3) "the review panel or review officer failed to follow university rules or regulations while reviewing the cited behavior."  Though the Code provided that SBAP would apply "a preponderance of the evidence standard," insufficiency of the evidence was not an authorized ground for appeal, and the Code also provided that "all appeals are documentary reviews in which no oral testimony is taken."  Finally, the Code provided that SBAP's

27

decision would become final and binding upon approval by USC's vice president for student affairs, who had "sole discretion" to approve or modify the decision.

Theta Xi appealed SJACS's decision on the grounds that (1) the decision was undermined by purportedly new evidence; (2) the six-year suspension was an excessive and inappropriate sanction; and (3) SJACS violated the USC Code by (a) failing to consider the totality of the evidence, (b) failing to review the matter in an impartial manner, and (c) failing to "apply the facts to the alleged policy violations . . . ." Theta Xi did not attempt to identify evidence that had been unknown or unobtainable during the investigation. Instead, it challenged the evidentiary support for SJACS's factual findings, relying on information that "was either provided to SJACS and not included in the SAR [report] or was never presented to Theta Xi for response."

In the course of its evidentiary challenges, Theta Xi suggested that SJACS's findings, even if true, did not warrant sanctions, emphasizing a lack of coercion. For instance, it claimed "wearing costumes was optional and was in no way mandated by any member of Theta Xi." It acknowledged that pledges participated in "fight night" events held every semester, but emphasized that participation was voluntary, and characterized "fight night" as a boxing lesson held in the spirit of "working out grievances in a healthy manner . . . ." In response to SJACS's finding that "[a]ctive members planned and executed drinking games for the new member class to

28

participate in," Theta Xi acknowledged, "Active members decided to drink and invited whomever wished to join." Theta Xi asserted there was no evidence that pledges had been *required* to drink, had been under 21, or had participated in any drinking games. In response to SJACS's finding that pledges had participated in the Power Hour and Great American Challenge drinking games, Theta Xi wrote, inter alia, "Power Hour and the Great American Challenge are drinking games that date back to the 1980s. Should we also penalize everyone that knows how to play Monopoly or Backgammon and [*sic*] if they play those a couple times each semester? The guys play video games every night while some choose to drink beers … [*sic*] would the University classify that as hazing as well? Again, all of these are just instances of people hanging out and playing games. No one was ever required or pressured to drink or to participate."

### 3. *SJACS's Response*

On September 17, 2018, SJACS sent SBAP a response to Theta Xi's appeal. In response to Theta Xi's reliance on purportedly new information, SJACS observed that Theta Xi had failed to explain why the information had been unobtainable during the investigation. SJACS added that Theta Xi had failed to support its evidentiary claims, stating, "For example, Theta Xi claims that there is no evidence that new members of the Fall 2016 class were not 21 years of age. SJACS reviewed student records via the USC Student Information System that clearly show that new members of

29

the Fall 2016 class were not 21 years old at the time the incident occurred."

In response to Theta Xi's argument that the six-year suspension was excessive and inappropriate, SJACS stated, "[USC Code section G.2] states that an organization may be held responsible for the acts of individual members 'when a member of the organization is violating state law or university standards and other members present fail to indicate their disapproval, or by their continued presence without objection implicitly condone their behavior.' Members of Theta Xi corroborated [Schaar's allegations] that alcohol was provided to new members of the Fall 2016 [pledge class] in violation of university standards and the Laws of the State of California."  SJACS again observed that "[t]he absence of the use of force does not excuse or legitimize" hazing or other activities prohibited by the USC Code.  SJACS expressed concern that in its appeal, Theta Xi had "continue[d] to deny the activities corroborated by [its] own members," and had failed to evaluate its culture, take responsibility for its members' actions, or outline strategies to prevent future violations.

### 4. *SBAP's Decision*

On December 5, 2018, a USC administrator provided Theta Xi with SBAP's decision upholding the six-year suspension, and informed Theta Xi that SBAP's decision had been reviewed and approved by Vice President for Student

Affairs Carry Ainsley. As discussed below, SBAP found the record did not support any of Theta Xi's appellate claims.

SBAP rejected Theta Xi's allegations that SJACS had failed to evaluate all the evidence in an impartial manner. SBAP observed that Theta Xi president Casillas had received notice of the alleged violations of the USC Code, and had been allowed to review and respond to the information gathered by SJACS. SJACS's case file included all evidence submitted by Theta Xi, and the SAR report articulated why SJACS did not find the evidence credible. Further, SJACS's case file included the entirety of the witnesses' statements, and the SAR report acknowledged conflicts among their statements.

SBAP concluded that Theta Xi's purportedly new evidence was not new because it had been known to Theta Xi during the investigation. SBAP observed that Theta Xi's reliance on this evidence "appeared to be an attempt to present the organization's version of the events to a different audience," and that SBAP was "not empowered to reconsider the evidence of the case and make different factual findings." SBAP further observed that in the "Rationale" section of the SAR report, SJACS had detailed which of Schaar's allegations had been corroborated by other witnesses. SBAP concluded that the corroborated allegations were sufficient to find, by a preponderance of the evidence, that Theta Xi violated all sections of the USC Code identified in the notice letter and SAR report.

SBAP found the six-year suspension neither excessive nor inappropriate.  SBAP observed that in the process of gaining recognition as a student organization, Theta Xi had agreed to abide by "rules and regulations surrounding alcohol and hazing . . . ."  SBAP further observed, "Theta Xi's organizational structure includes risk managers, advisors, and leadership tasked with ensuring that members act in accordance with these rules and regulations.  Despite this, the organization chose to engage in conduct that it knew was not in accordance with the University's standards. . . . [T]he suspension of the organization . . . will allow time for the organization to reform under a new culture and with new leadership . . . ."

## C. *Theta Xi's Writ Petition*

On October 5, 2018, Theta Xi filed a petition for a writ of administrative mandamus against USC, Budar-Turner, and Carry.  On February 11, 2019, Theta Xi filed an amended petition.  Theta Xi alleged that USC had deprived Theta Xi of a fair procedure and committed a prejudicial abuse of discretion within the meaning of Code of Civil Procedure section 1094.5.

### 1. *Briefing*

Theta Xi devoted most of its opening brief to arguments that USC's administrative procedure was unfair because (1) USC had provided Theta Xi inadequate notice of the allegations and evidence underlying USC's ultimate

decision; (2) a single individual (Budar-Turner) had exercised investigative and adjudicatory functions; (3) Theta Xi had been given no opportunity to cross-examine witnesses; and (4) SJACS had failed to evaluate the evidence in an impartial manner.[13] Theta Xi also argued that SJACS's factual findings had been unsupported by the evidence, under either a substantial evidence or independent judgment standard of review. It argued that an independent judgment standard was proper because the six-year suspension substantially affected Theta Xi's vested fundamental rights "to engage in fraternity activities at USC"; "to house members, fundraise and seek new membership at USC"; and to maintain its reputation. Within the section of its brief devoted to challenging the evidentiary support for SJACS's findings, Theta Xi asserted that the SAR report contained "no explanation linking . . . the mostly innocuous factual findings . . . to the alleged policy violations," and implied that SJACS had therefore failed to "set forth findings to bridge the analytic gap

---

[13] In support of its argument concerning inadequate notice, Theta Xi asserted that "SJACS had no jurisdiction under its Code" to investigate events that preceded Schaar's administrative complaint by more than one year. It quoted the section of the USC code providing, "Generally, a matter will be reviewed only when a report has been filed with [SJACS] within one year of discovery of the alleged violation." Theta Xi did not develop this argument further, and did not allege that USC had "proceeded without, or in excess of, jurisdiction" within the meaning of Code Civil Procedure section § 1094.5, subdivision (b).

between the raw evidence and ultimate decision," as required by *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 (*Topanga*). It did not develop its *Topanga* argument further.

In its opposition brief, USC argued that its administrative procedure had been fair, emphasizing that administrative procedures need not be as formal as judicial procedures, and that much of the caselaw on which Theta Xi relied concerned discipline of students for sexual misconduct, not discipline of a student *organization* for violating rules related to alcohol and hazing. USC further argued that the trial court was required to review SJACS's factual findings only for substantial evidence, as the six-year suspension did not substantially affect any vested fundamental right held by Theta Xi. Finally, USC argued that SJACS's factual findings were supported by substantial evidence. In identifying the evidence it found most alarming, USC noted, inter alia, the police report that in August 2017, underage Theta Xi member Chris Ladan had been transported to a hospital for "alcohol poisoning treatment" after being found vomiting and unable to answer basic questions, reportedly after drinking at the Theta Xi house.

In its reply brief, Theta Xi generally repeated the arguments made in its opening brief. However, it did not argue that SJACS had violated the requirements of *Topanga*, *supra*, 11 Cal.3d 506. Nor did it repeat its argument that the six-year suspension substantially affected its vested fundamental rights. Instead, it argued that

34

because USC is a private entity, USC's factual findings should be reviewed under an independent judgment standard, even in the absence of a substantial effect on any vested fundamental right. In replying to USC's reference to underage Theta Xi member Chris Ladan's alcohol overdose, Theta Xi emphasized that Ladan had been nearly 21 years old, and that he had been found "away from" the Theta Xi house -- ignoring Ladan's report that he had been drinking *at* the Theta Xi house.

## 2. *Hearing and Ruling*

At the outset of the hearing on Theta Xi's petition, the trial court observed that it had issued a tentative ruling generally adverse to Theta Xi. The court proceeded, however, to express concerns that SJACS might have provided inadequate notice of the allegations underlying its ultimate decision, and might have failed to bridge the analytic gap between its factual findings and its decision, as required by *Topanga*, *supra*, 11 Cal.3d 506. After hearing argument from both parties, primarily on these issues, the court took the matter under submission.

On October 28, 2019, the trial court issued an order denying Theta Xi's petition. In its 19-page decision, the court found the administrative procedure had been fair. It found SJACS's notice letter satisfied the requirements of the USC Code, and that Theta Xi had received adequate notice of the factual basis of the allegations through Casillas's January and May 2018 meetings with SJACS's

35

investigators.  Further, because Casillas and attorney Hathaway had reviewed SJACS's evidence during the May 2018 meeting, and Casillas thereafter had submitted all additional evidence Theta Xi wished to submit, the court found Theta Xi had received adequate opportunities to review and produce evidence.  Finally, the court found Theta Xi was not entitled to cross-examination of witnesses or separation of investigative and adjudicative functions.  It reasoned that caselaw had recognized a right to such safeguards only in cases of student discipline for sexual assault.  The court found this caselaw distinguishable, reasoning in part, "[G]iven the severity of the consequences to a student and the fact that, in a sexual assault case, there is very limited corroborating evidence, if any, and often a credibility contest between only two individuals -- a right to cross examine in a sexual assault case is critical to ensuring a fair hearing.  [¶] In contrast, here, the severity of the sanction to any individual student directly is nonexistent; the investigation and subsequent proceeding only affected the rights of the fraternity, a private association, to participate as an on-campus organization. . . .  [¶] Also, unlike a sexual assault case, where the case often depends on the credibility of the only two people involved, the hazing case here had numerous potential witnesses; for example, [Theta Xi]'s own investigation into the allegations involved deposing fourteen witnesses. . . .  Further, SJACS relied on other corroborating evidence, such as text messages."

36

The court observed that Theta Xi's opening brief had conflated two distinct issues: (1) whether sufficient evidence supported SJACS's factual findings; and (2) whether SJACS's factual findings were adequate under *Topanga, supra*, 11 Cal.3d 506 to support USC's decision. The court further observed that Theta Xi had provided "no real analysis" of the *Topanga* issue, and had not addressed the issue in its reply brief. The court did not address the merits of the *Topanga* issue.

Finally, the court found that SJACS's factual findings were supported by substantial evidence. In rejecting Theta Xi's argument that an independent judgment standard should apply, the court reasoned that the Courts of Appeal had consistently applied the substantial evidence standard in cases of student discipline for sexual misconduct, and that "USC's refusal to recognize [Theta Xi], a fraternal organization, for six years [is] no more burdensome than a student's expulsion from a private university because of sustained sexual misconduct allegations." The court further reasoned that the record did not support Theta Xi's claim to a vested fundamental right to "'engage in fraternity activities at USC,'" as the USC Code provided that a student organization's recognition was conditioned on annual approval, and that student organizations could be sanctioned for violations of university rules. Applying the substantial evidence standard, the court found "significantly more" than substantial evidence, as the administrative record included (1) statements by Schaar supporting SJACS's factual

findings; (2) SJACS's finding that most of Schaar's allegations had been corroborated by Theta Xi members' text messages and interview statements; and (3) Casillas's statement, after reviewing SJACS's evidence, that the evidence contained only """"a few"""" inaccuracies. The court specifically found substantial evidence that underage pledges had been provided alcohol during Theta Xi activities, observing that (1) "the record is replete with references to the pledge class members, including Schaar, drinking alcohol in the context of activities promoted by [Theta Xi]"; (2) SJACS's notes from Casillas's interview twice referred to "'letting'" underage drinking occur; and (3) the report regarding Theta Xi member Chris Ladan's alcohol overdose indicated that Ladan, then underage, had been drinking at the Theta Xi house on August 19, 2017.

On December 13, 2019, the court entered judgment against Theta Xi. Theta Xi timely appealed.

## DISCUSSION

Theta Xi contends (1) USC acted in excess of its jurisdiction by suspending its recognition of Theta Xi's local chapter based on events that preceded Schaar's complaint by more than one year; (2) SJACS's factual findings were unsupported by the evidence; (3) USC's decision was unsupported by SJACS's factual findings; and (4) USC's administrative procedure was unfair.

## A. *Jurisdiction*

An administrative decision must be set aside where "the respondent has proceeded without, or in excess of, jurisdiction . . . ." (Code Civ. Proc., § 1094.5, subd. (b).) "Because administrative agencies are tribunals of limited jurisdiction, they can exercise quasi-judicial authority only to the extent authorized by the statutes or constitutional provisions that created them. [Citation.] Jurisdictional issues arise when an agency acts outside the scope of its statutory or constitutional authority. In addition, an agency can act in excess of its jurisdiction when it fails to stay within the procedural rules and regulations it has established . . . ." (CEB, Cal. Administrative Mandamus (May 2020) § 6.3.)

Here, USC acted within its jurisdiction in suspending its recognition of Theta Xi's USC chapter, even to the extent its action was based on events that preceded Schaar's complaint by more than one year. As a private entity, USC was not bound to act only within the confines of certain statutory or constitutional authority. In any event, Theta Xi has not argued that any statute or constitutional provision barred USC from acting on events that preceded Schaar's complaint by more than one year. Instead, Theta Xi relies solely on the section of the USC code providing, "Generally, a matter will be reviewed only when a report has been filed with [SJACS] within one year of discovery of the alleged

39

violation."[14]  Theta Xi has not shown that SJACS violated this limitations policy.  The policy provides only that SJACS "[g]enerally" will not investigate untimely complaints -- not that SJACS cannot, shall not, or may not investigate them. Theta Xi cites no authority, and offers no persuasive rationale, for its interpretation that this policy prohibited the investigation of untimely complaints in the absence of exceptional circumstances.

Moreover, there were ample grounds for SJACS to find that the circumstances warranted an exception to its general limitations policy.[15]  As Theta Xi acknowledges, Schaar's complaint was submitted 14 months after the fall 2016 initiation week.  Thus, with respect to Schaar's allegations of hazing during that week, the complaint was untimely only

---

[14]    In response to Theta Xi's reliance on this limitations policy, USC quotes from the following language within the same section of the USC Code:  "There is no time limit for cases involving academic, sexual, interpersonal, and protected class misconduct, and those matters will be reviewed whenever they are reported; such matters should be filed with the Office of the Title IX Coordinator, as explained in the University's Policy and Procedures on Student Sexual, Interpersonal, and Protect Class Misconduct."  This language was inapplicable to SJACS's review of Schaar's complaint.  The USC Code provided that SJACS was not responsible for "reviews of Sexual, Interpersonal, and Protected Class Misconduct."

[15]    The record is silent regarding whether SJACS made such a finding.  However, because Theta Xi did not raise the limitations issue during the administrative process, SJACS had no incentive to make an express finding on the issue.

40

by two months. There was little prospect that this modest untimeliness would obstruct the investigation or prejudice Theta Xi's defense. By their nature, allegations of fraternity hazing involve many prospective witnesses, including the fraternity's active members and pledges. Moreover, SJACS reasonably could have predicted that Theta Xi's initiation of new members involved traditional or recurring events, reducing the likelihood that the prospective witnesses would have forgotten the circumstances of the fall 2016 initiation week. Indeed, Theta Xi does not claim that any evidence had gone stale.

The cases on which Theta Xi relies are distinguishable, as none addressed a limitations policy or other time restriction. (See *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055; *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265; *BMW of North America, Inc. v. New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980.) Moreover, one of these cases did not address any jurisdictional challenge. (See *Doe v. Claremont McKenna College*, *supra*, at 1057-1058 [holding only that university's procedure in disciplining student for sexual assault was unfair].) Another rejected a jurisdictional challenge. (See *Berman v. Regents of University of California*, *supra*, at 1270-1271, 1274-1276 [rejecting contention that university council of deans of student affairs acted in excess of its jurisdiction by imposing suspension not recommended by student conduct review board].) Though the remaining case found an agency had acted in excess of

41

its jurisdiction, its holding was based on the agency's nature as a government entity with no power to act except as authorized by law; the agency's act was unauthorized because none of the statutory predicates for the act had occurred. (See *BMW of North America, Inc. v. New Motor Vehicle Bd.*, *supra*, at 994-995.) USC is a private entity. It needs no statutory authorization to suspend its recognition of another private entity for violations of its private rules.

In sum, Theta Xi has not shown that USC violated its limitations policy. Thus, even assuming the limitations policy restricted USC's jurisdiction, Theta Xi has not shown that USC acted in excess of its jurisdiction in suspending its recognition of Theta Xi's USC chapter.

### B. *Sufficiency of the Evidence*

"Abuse of discretion is established if . . . the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) Here, the trial court concluded that SJACS's factual findings were supported by substantial evidence, and that nothing more was required. Theta Xi contends (1) the court erred by applying the substantial evidence standard rather than exercising its independent judgment; and (2) there was insufficient evidence to support SJACS's factual findings under any standard.

**1.** *Standard of Review*
**a.** *Principles*

"Under Code of Civil Procedure section 1094.5, there are two alternative standards of review that a trial court uses to review [challenges to an agency's factual findings raised by] a petition for writ of administrative mandamus. [Citation.] 'If the administrative decision involved or substantially affected a "fundamental vested right," the superior court exercises its independent judgment upon the evidence . . . . [Citations.]' [Citations.] 'Where no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record.'"[16] (*Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1280 (*Benetatos*).) "Courts determine on a case-by-case basis whether a right is 'vested' and

---

[16] In its reply brief, for the first time, Theta Xi urges us to discard these well-established principles and hold that trial courts must always exercise independent judgment in reviewing the evidentiary support for a private entity's administrative findings, even in the absence of a substantial effect on a vested fundamental right. Theta Xi forfeited this contention by failing to raise it in its opening brief. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408 ["'It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party'"].) In any event, Theta Xi offers no persuasive reason to discard the principles.

'fundamental,' taking into account both economic effects and effects 'in human terms and the importance of [the right] to the individual in the life situation.'" (*JMS Air Conditioning & Appliance Service, Inc. v. Santa Monica Community College Dist.* (2018) 30 Cal.App.5th 945, 960 (*JMS*).) As Theta Xi's cited cases recognize, "'[t]he ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power.'" (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313; accord, *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1526 (*Goat Hill Tavern*); *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 779, fn. 5; see also *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 894 [issue "relates to the appropriate relationship between administrative and judicial adjudicatory decisions" (italics omitted)].)

"Courts have rarely viewed purely economic interests, such as the right to profit under a particular business venture, as a fundamental vested right." (*JMS*, *supra*, 30 Cal.App.5th at 960.) "Purely financial effects will only affect 'fundamental' rights in extreme, unique situations, such as when an administrative decision imposes 'operating conditions [that] severely impair [a company's] ability to function or . . . drive [the company] out of business.'" (*Ibid.*; see also *Benetatos*, *supra*, 235 Cal.App.4th at 1281-1282 [city's imposition of conditions on operation of fast-food restaurant did not substantially affect any vested

44

fundamental right held by restaurant's owners, where owners "suggested only an economic effect from the required operating conditions"].)

The parties have cited no caselaw on this issue involving discipline of student organizations, and we have found none. However, "[t]his and numerous courts have applied [the substantial evidence] standard to disciplinary decisions involving [students'] sexual misconduct at private and public universities." (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1060 (*Allee*); see also *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1231 ["A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right"]; *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 248-253 (*USC 2016*) [concluding no substantial evidence supported SJACS's factual findings in sexual-misconduct case].)

### b. *Analysis*

We conclude that USC's decision to suspend its recognition of Theta Xi's local chapter did not substantially affect any vested fundamental right held by Theta Xi.[17] As

_____

[17] Theta Xi lacks standing to assert vested fundamental rights held by others. (See *Interstate Brands v. Unemployment Ins. Appeals Bd.*, *supra*, 26 Cal.3d at 781 ["'[A] party has no standing to assert that an independent judgment review rather than a substantial evidence review is required unless it possesses a fundamental vested right *on its own behalf* which was involved *(Fn. is continued on the next page.)*

45

noted, we and other courts have found no substantial effect on any vested fundamental right where universities have sanctioned students for sexual misconduct. (See, e.g., *Allee, supra*, 30 Cal.App.5th at 1060.) Here, the asserted right -- a fraternity's right to remain recognized by a private university in the face of alleged violations of university rules -- has no more significance, from the perspective of the appropriate relationship between administrative and judicial decisions, than a student's right to remain enrolled in the face of allegations of sexual misconduct. We see nothing inappropriate in the suspension of a private university's recognition of a fraternity by the university itself rather than by a court, particularly where the suspension is based on violations of the university's private rules.

The cases on which Theta Xi relies are distinguishable. Most concerned rights unrelated to Theta Xi's asserted right to continue operating its USC chapter. (See *Wences v. City of Los Angeles, supra*, 177 Cal.App.4th at 316 [police department's reprimand of employee substantially affected employee's vested fundamental right in his public employment]; *Interstate Brands v. Unemployment Ins. Appeals Bd., supra*, 26 Cal.3d at 780-781 [Unemployment Insurance Appeals Board's award of benefits to employees substantially affected employer's vested fundamental right to be free from erroneous charges to its unemployment

in an administrative agency's action'"].) We therefore need not address Theta Xi's references to its members' association rights.

insurance]; *Berlinghieri v. Department of Motor Vehicles*, *supra*, 33 Cal.3d at 397-398 [DMV's suspension of driver's license substantially affected driver's vested fundamental right to retain license].)  In the remaining case, the Court of Appeal held that a city's decision not to renew a tavern's conditional use permit would have substantially affected the tavern owner's vested fundamental right to continue operating his business (had the city's decision not been set aside), reasoning that the decision would have driven the tavern out of business.  (*Goat Hill Tavern, supra*, 6 Cal.App.4th at 1527-1531.)  Here, however, Theta Xi -- a national organization with headquarters in Missouri, with chapters at multiple universities even within California -- does not argue that the six-year suspension of its USC chapter will drive it out of business.  Instead, Theta Xi merely complains of a loss of revenue.  Such a run-of-the-mill economic impact does not establish that the suspension will substantially affect a vested fundamental right.  (See *Hardesty v. Sacramento Metropolitan Air Quality Management Dist.* (2011) 202 Cal.App.4th 404, 415-417 [distinguishing *Goat Hill Tavern*; air quality management district's order for mining company to cease operations until it obtained permit did not substantially affect any vested fundamental right held by company, where nothing in record indicated obtaining permit would drive company out of business]; *JMS, supra*, 30 Cal.App.5th at 960 [community college district's decision to allow subcontractor to be replaced on construction project did not substantially affect

47

any vested fundamental right held by subcontractor, despite its potential to cause subcontractor to lose money]; *Benetatos*, *supra*, 235 Cal.App.4th at 1281-1282.)

In sum, because USC's decision did not substantially affect any vested fundamental right held by Theta Xi, the trial court properly declined to exercise its independent judgment in reviewing the evidentiary support for SJACS's factual findings, and properly applied the substantial evidence standard instead.

### 2. *Application of Substantial Evidence Standard*

Because the trial court properly applied the substantial evidence standard, "our review is the same as the trial court's -- we review the administrative record to determine whether substantial evidence supports the agency's findings." (*Benetatos*, *supra*, 235 Cal.App.4th at 1281.) "In that review, we resolve all conflicts in the evidence and draw all inferences in support of the agency's findings." (*Ibid.*)

Theta Xi challenges the evidentiary support for many (although not all) of SJACS's factual findings. We address each challenged finding in turn.

### a. *Alcohol-Related Findings*

Substantial evidence supported SJACS's finding that Theta Xi violated the prohibition against serving alcohol at rush events. On January 11, 2017, Theta Xi member Weilbacker sent a text message advertising a "Dirty Rush

48

Beer Pong Tournament" that would be attended by "a few potential members . . . ." Fellow member Anish Mahadeo inquired whether beer pong would be played the next day too, and Weilbacker replied that he was contemplating playing Power Hour (another drinking game) instead. The next day, Weilbacker stated in another message, "[W]e will be inviting rushees . . . to the house tonight. Probably power hour and/or rage cage [yet another drinking game]." When shown these messages during his SJACS interview, Weilbacker said, "'[A]ll fraternities do this.'"

Relatedly, substantial evidence supported SJACS's findings that pledges participated in drinking games and drank large amounts of alcohol during the Around the World event. Theta Xi member Eisenberg said that pledges sometimes participated in drinking games, and that he had participated in the Great American Challenge drinking game as a pledge. Eisenberg further said that he had drunk during the Around the World event, and implied that other pledges had drunk too (by stating they had not "really" drunk). Theta Xi president Casillas acknowledged that pledges were allowed to participate in the Great American Challenge, and to drink during the Around the World event. Theta Xi member Ortega said that the Great American Challenge was usually played in teams of "actives vs. associates," implying that a substantial number of pledges typically participated, and that in fall 2017, pledges had participated alongside active members on "mixed" teams.

Finally, substantial evidence supported SJACS's finding that *underage* pledges drank alcohol during Theta Xi events. There was specific evidence of underage drinking at Theta Xi events or in the Theta Xi house, viz., (1) two references in Casillas's interview notes to allowing underage drinking to occur; and (2) the campus police report indicating that Theta Xi member Chris Ladan, then underage, had been drinking heavily at the Theta Xi house on August 19, 2017. Further, SJACS stated that it had reviewed student records and confirmed that the members of the fall 2016 pledge class had been underage in fall 2016. Theta Xi did not submit evidence, and has not claimed on appeal, that any member of the fall 2016 pledge class was 21 or older at the time. Though the student records are not in the administrative record, they are inessential to a finding of substantial evidence, as SJACS reasonably could infer that many pledges were underage. During Theta Xi's internal interviews of its members, one member stated he had joined Theta Xi as a freshman, and another stated he had joined as a sophomore. Additionally, by stating when they joined Theta Xi and when they expected to graduate, several other members implied they had joined as freshmen or sophomores (i.e., more than two school years in advance of their expected graduation dates). As Theta Xi acknowledges, "It may be correct to presume that most university freshmen and sophomores are under age 21 . . . ."

## b. *Other Challenged Findings*

Substantial evidence supported SJACS's finding that, as Schaar alleged, the fall 2016 pledge class had been required to sleep in the Theta Xi house's small library during initiation week.  Eisenberg, who had belonged to the pledge class, said that the pledges had been told to stay in the library, and that most pledges had slept in the library during initiation week.  Weilbacker, who also had belonged to the pledge class, said he had slept in the library for four or five days.  Casillas, who had been the "pledge master" or "associate member educator" in fall 2016, said that all pledges usually slept in the Theta Xi house during initiation week, and that the library was set up for them to sleep in.  Ortega, who had been the "assistant pledge master" in fall 2016, said that the library had been the "main space," and that some pledges had slept in it.  Finally, in a text message sent on October 28, 2016, Theta Xi member Derek Cheng wrote that "the AM [associate member] group" would "need to keep that room clean if they want[ed] to sleep undisturbed for the rest of I-week[.]"

Substantial evidence also supported SJACS's finding that pledges participated in "fight night" events.  Several Theta Xi members confirmed that pledges participated.  Indeed, in its administrative appeal, Theta Xi admitted that pledges participated.  Theta Xi now asserts there was no substantial evidence to support a finding that pledges were *forced* to participate, but acknowledges that SJACS made no such finding.

Theta Xi additionally challenges the evidentiary support for factual findings that, as we explain in more detail below, were inessential to USC's suspension decision. SJACS found that in fall 2016, pledges had been dropped off at UCLA with a list of tasks to perform, including finding Theta Xi's UCLA chapter and finding their way back to USC. SJACS also found that in fall 2017, pledges had participated in workouts led by Ortega (then pledge master), and at times had been required to carry 25-pound weights. But the SAR report, SJACS's response to Theta Xi's administrative appeal, and SBAP's decision all focused on misconduct unrelated to these findings. Thus, assuming, arguendo, that SJACS abused its discretion by making these findings in the absence of substantial supporting evidence, the abuse of discretion was not prejudicial. (See Code Civ. Proc., § 1094.5, subd. (b) [administrative decision must be set aside if "there was any *prejudicial* abuse of discretion" (italics added)].)

### C. *Sufficiency of the Findings*

Theta Xi contends SJACS's factual findings were inadequate to support USC's decision. It further contends this inadequacy warrants annulment of the administrative action or, in the alternative, remand to USC for additional findings.

52

### 1. *Principles*

An administrative decision must be set aside if "there was any prejudicial abuse of discretion."  (Code Civ. Proc., § 1094.5, subd. (b).)  "Abuse of discretion is established if . . . the order or decision is not supported by the findings . . . ."  (*Ibid.*)  Our Supreme Court has interpreted this latter language as establishing "a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order."  (*Topanga, supra,* 11 Cal.3d at 515.)  The findings must be sufficient "both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the [administrative] action."  (*Id.* at 514.)

However, "'[a]dministrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein.' [Citation.]  An agency's findings under Code of Civil Procedure section 1094.5 '*do not need to be extensive or detailed.*' [Citation.]  'In addition, findings are to be liberally construed to support rather than defeat the decision under review.' [Citation.]"  (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 421; see also *Topanga, supra,* 11 Cal.3d. at 514 ["the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision"].)  ""[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an

agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].'""" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 516; see also *Kifle-Thompson v. State Bd. of Chiropractic Examiners* (2012) 208 Cal.App.4th 518, 521 & fn.2, 530-531 [State Board of Chiropractic Examiners complied with *Topanga* in revoking chiropractor's license as sanction for engaging in six separately defined varieties of "unprofessional conduct," where Board found chiropractor had conspired in formation of sham medical corporations and participated in insurance fraud; it "require[d] no great analytic leap" for Court of Appeal to conclude from these findings that chiropractor had committed all six varieties of unprofessional conduct].)

### 2. *Analysis*

We conclude SJACS's factual findings adequately supported USC's decision to suspend its recognition of Theta Xi's local chapter for six years. First, the findings were sufficient to "enable the parties to determine whether and on what basis they should seek review . . . ." (*Topanga*, *supra*, 11 Cal.3d at 514.) As is evident from the briefing, Theta Xi has sought review on multiple bases. In doing so, it has not asserted any prejudice from the purported vagueness of SJACS's analysis, with one exception -- it asserts that "it is

54

impossible to decipher which members supposedly engaged in prohibited activity," and "equally impossible to mount a defense against such ambiguity." But SJACS found that Theta Xi members had performed prohibited acts, including organizing and observing pledges' participation in "fight nights" and unauthorized drinking events (including the Around the World event and other drinking games), and imposing requirements for pledges to sleep in the small library. Moreover, SJACS identified Casillas and Ortega by name and observed that they had been the "pledge master" and "assistant pledge master" in fall 2016, implying that they had orchestrated or been involved in all the prohibited acts at that time. The acts were identified with sufficient particularity to enable Theta Xi to mount a defense on the grounds that the acts had not occurred, or had not been committed or implicitly condoned by Theta Xi members.

SJACS's findings also were sufficient to apprise us of the basis for the suspension. (See *Topanga, supra,* 11 Cal.3d at 514.) The USC Code provided that a student organization's recognition by the university could be suspended upon a finding of a hazing violation, or a finding that the organization had engaged in, encouraged, or failed to take reasonable steps to prevent violations of university rules. In the SAR report, SJACS made such findings -- indeed, it found that Theta Xi had violated nine sections of the USC Code, including section 11.40 (prohibiting unauthorized dissemination of alcohol) and section 11.50.D (prohibiting violations of section G.2, which incorporates

55

USC's hazing policy by reference). In response to Theta Xi's argument to SBAP that the suspension was excessive and inappropriate, SJACS stated, "[USC Code section G.2] states that an organization may be held responsible for the acts of individual members 'when a member of the organization is violating state law or university standards and other members present fail to indicate their disapproval, or by their continued presence without objection implicitly condone their behavior.' Members of Theta Xi corroborated [Schaar's allegations] that alcohol was provided to new members of the Fall 2016 [pledge class] in violation of university standards and the Laws of the State of California." SJACS thereby revealed that its many factual findings concerning unauthorized drinking, which obviously were linked to Theta Xi's violation of USC Code section 11.40, were also linked to Theta Xi's violation of section G.2, and that SJACS attached special significance to the latter violation. Elsewhere in SJACS's response to Theta Xi's appeal, SJACS referenced its "findings" (implied in the SAR report) that Theta Xi members had "engaged in behavior that is considered to be hazing . . . ." Similarly, in rejecting Theta Xi's argument that the suspension was excessive and inappropriate, SBAP observed that in the process of gaining recognition as a student organization, Theta Xi had agreed to abide by rules concerning "alcohol and hazing . . . ."

These statements, along with the SAR report, reveal that USC's suspension decision was based on SJACS's findings that in fall 2016 and fall 2017, Theta Xi's active

56

members expected and at times required underage pledges to participate in drinking games designed to induce severe inebriation, subjected pledges to requirements likely to compromise their dignity and deprive them of sleep, and encouraged pledges to fight other members as a spectator sport. It requires no great analytic leap for us to conclude that these activities violated the specified USC Code sections prohibiting unauthorized dissemination of alcohol (section 11.40), risks to health or safety (sections 11.32.A and 11.36.B), disruptive behavior (sections 11.38 and 11.44.A), and hazing (sections 11.44.C, 11.50.B, 11.50.C, and 11.50.D), keeping in mind that USC defined hazing to include coercing *or* permitting students to drink alcohol to excess, depriving students of eight hours of sleep, and compromising any affiliated student's dignity.[18] SJACS found that during a brotherhood retreat, pledges were required to participate in an Around the World event featuring at least five varieties of alcoholic beverages, during which pledges were encouraged to drink in large quantities, and some members fell ill. Within the Theta Xi house, pledges played Power Hour (each

---

[18] USC Code sections 11.44.C, 11.50.B, 11.50.C, and 11.50.D do not expressly prohibit hazing, but they prohibit categories of misconduct encompassing hazing, viz., (1) misconduct prohibited within the university community; (2) violations of policies established for Greek-letter organizations; (3) violations of any university policies; and (4) violations of section G.2, which incorporates the hazing policy by reference. As explained below, Theta Xi received adequate notice of SJACS's investigation into hazing violations.

57

participant drank a shot of beer every minute for an hour), War (each team drank 60 cups of beer and Four Loko as fast as possible), and the Great American Challenge (each team raced to consume a 30-pack of beer, in addition to pizza and marijuana). Throughout their initiation week, all 11 members of the 2016 pledge class were required to sleep in the Theta Xi house's small library, which was not large enough to accommodate them. If they wished to sleep undisturbed, they were required to clean the library to the active members' satisfaction -- which text messages indicated they failed to do, prompting an active member to announce his intent to ensure they never failed again. At the same time, pledges wore costumes of cartoon and comic book characters at the request of active members. Moreover, during "fight night," pledges participated in widely viewed fights, at times resulting in noise complaints. The USC Code provided that the university could suspend its recognition of a student organization if SJACS found even a single hazing violation, or a violation of other university rules. Thus, the record reveals that SJACS found those facts essential to sustain USC's decision on its theory of recurring violations of its hazing and alcohol policies. (See *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at 516.)

Based on the foregoing, and resolving reasonable doubts in favor of USC's ultimate decision (see *Topanga*, *supra*, 11 Cal.3d at 514), we infer that SJACS's remaining factual findings were inessential to the suspension. Thus,

even assuming USC abused its discretion in failing to adequately reveal the analytical significance it attached to those findings, Theta Xi was not prejudiced. (See Code Civ. Proc., § 1094.5, subd. (b) [administrative decision must be set aside if "there was any *prejudicial* abuse of discretion" (italics added)].)

Theta Xi cites no caselaw on this issue other than *Topanga* itself, which is distinguishable. There, a county planning commission granted an investment company a zoning variance, which was required by statute to be based on comparative information regarding the property at issue and other properties. (*Topanga, supra*, 11 Cal.3d at 520.) Our Supreme Court found the commission's findings deficient because they lacked any such information. (*Ibid.*) Here, Theta Xi has identified no requirement for USC to rely on a specific category of information in rendering its decision, let alone a category of information omitted from SJACS's factual findings.

In sum, we conclude that USC adequately revealed its "analytic route . . . from evidence to action" in suspending its recognition of Theta Xi's local chapter for violating university rules. (*Topanga, supra*, 11 Cal.3d at 514-515.) This is especially true in light of SJACS's and SBAP's observations that Theta Xi failed to evaluate its culture or take responsibility for its members' actions, and that the six-year suspension would incentivize Theta Xi to make changes to its culture and leadership before seeking to resume activities as a USC student organization. We note

59

that in the trial court and this court, Theta Xi has at times minimized the risks of a culture in which young men pressure their peers into excessive drinking and other violations of university rules. For instance, in addressing underage Theta Xi member Chris Ladan's alcohol overdose in the trial court, Theta Xi emphasized that Ladan was only slightly underage, and that he had been found (vomiting, confused, and in need of medical attention) "away from" the Theta Xi house -- ignoring Ladan's report that he had been drinking *at* the Theta Xi house. On appeal, Theta Xi continues to deny the existence of evidence of peer pressure within its ranks, and minimizes the power of such pressure by implying it is unlikely to affect anyone with "individual agency and the ability to make rational decisions for their safety and well-being." Such positions reflect a failure to appreciate the value of university rules that, as SJACS and SBAP emphasized, require a student organization to maintain an environment free from even ostensibly voluntary violations among its members.

### D. *Fair Hearing*

An administrative decision rendered without a "fair trial" must be set aside. (Code Civ. Proc., § 1094.5, subd. (b).) In this context, a fair trial means a fair administrative hearing. (*Allee*, *supra*, 30 Cal.App.5th at 1059.) As the parties agree, we review de novo the fairness of the administrative hearing. (*Ibid.*)

60

Theta Xi contends it was deprived of a fair hearing because (1) it received inadequate notice of the allegations that served as the basis for the suspension; (2) it received inadequate opportunities to review and produce evidence; and (3) SJACS was biased, as evidenced by (a) SJACS's failure to investigate Schaar's alleged retaliatory motive and transgressions against women, (b) SJACS's placing a hold on Theta Xi member Eisenberg's student records to induce his consent to an interview, without similarly seeking to induce an interview with Sarah Nuckel, the author of a written statement that Schaar had submitted with his complaint, (c) the allegedly objectionable manner in which SJACS Director Budar-Turner interviewed Casillas, and (d) SJACS's denial of Theta Xi member Weilbacker's request to have an advisor present during his interview. Theta Xi additionally contends that its status as an established student organization entitled it to a heightened standard of fairness, and that SJACS's procedures fell short of such a heightened standard because (1) Theta Xi had no opportunity to cross-examine witnesses; (2) SJACS exercised both investigative and adjudicatory functions; and (3) the administrative appeal procedure was inadequate.

### 1. *Principles*

"For practical purposes, common law requirements for a fair disciplinary hearing at a private university mirror the due process protections at public universities." (*Allee, supra*, 30 Cal.App.5th at 1061.) "Disciplinary hearings 'need not

61

include all the safeguards and formalities of a criminal trial.'" (*Id.* at 1062.) "[T]he essence of both [the common law and due process] rights is the fairness of the decision-making process, including adequate notice, a reasonable opportunity to respond, and a fair, unbiased decision-maker." (CEB, Cal. Administrative Mandamus, *supra*, § 5.32.) Though fairness requires an unbiased decision maker, "[a] disciplinary decision may not be invalidated solely on the basis of an inference or appearance of bias." (*Allee*, *supra*, at 1060.) Instead, a party claiming bias bears the burden of showing actual bias, or a high probability thereof. (See *ibid.*)

"Generally, a fair procedure requires 'notice reasonably calculated to apprise interested parties of the pendency of the action . . . and an opportunity to present their objections.'" (*USC 2016*, *supra*, 246 Cal.App.4th at 240.) However, "[t]he rules of pleading that apply in ordinary civil actions do not apply to administrative proceedings. The courts consider whether the accused received fair notice, apart from any technical requirements of pleading; what is required is disclosure of charges adequate to allow the accused to prepare a defense and to avoid being disadvantaged by surprise at the hearing." (CEB, Cal. Administrative Mandamus, *supra*, § 6.81.)

"Fair hearing requirements are 'flexible' and entail no 'rigid procedure.'" (*Allee*, *supra*, 30 Cal.App.5th at 1062.) "'"[T]o comport with due process," the university's procedures should '"be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be

heard," [citation] . . . to insure that they are given a meaningful opportunity to present their case."""" (*Ibid.*) Even when recognizing a right to administrative cross-examination in certain circumstances, we have """"reject[ed] the notion that as a matter of law every administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses."""" (*Allee*, *supra*, at 1067, quoting *USC 2016*, *supra*, 246 Cal.App.4th at 245.) We have also recognized that "an administrative procedure in which a single individual or body investigates and adjudicates does not, 'without more,' violate due process." (*Allee*, at 1067.)

### 2. *Analysis*

We conclude that Theta Xi received a fair administrative hearing. Theta Xi's arguments to the contrary concern (1) notice; (2) opportunities to review and produce evidence; (3) bias; and (4) Theta Xi's purported right to heightened procedural safeguards. We address each.

First, Theta Xi received adequate notice. SJACS's notice letter listed all the USC Code sections that Theta Xi was ultimately found to have violated. The letter also identified "Hazing" as the factual basis of the allegations, thereby directing Theta Xi's attention to USC's hazing policy -- which was incorporated into several of the USC Code sections identified in the notice, and which Theta Xi used as the source of nearly all its questions in its internal

interviews.[19] Moreover, SJACS shared the factual specifics of Schaar's complaint with Theta Xi's president (Casillas) and his advisor (Toghia) a mere two days after it sent the notice letter. The factual basis for the SJACS and SBAP decisions closely tracked Schaar's allegations, to the extent they were found credible. Thus, Theta Xi received "'notice reasonably calculated to apprise [it] of the pendency of the action . . . and an opportunity to present [its] objections.'" (*USC 2016, supra,* 246 Cal.App.4th at 240.)[20]

---

[19] Theta Xi complains that SJACS never "expressly charged" a violation of USC's hazing policy. But SJACS's notice letter was not a formal charging document, and Theta Xi was not entitled to one. (See CEB, Cal. Administrative Mandamus, *supra,* § 6.81.)

[20] Theta Xi argues that our holding in *USC 2016* establishes that it received inadequate notice. Not so. There, a student (John) was accused of misconduct in connection with the sexual assault of a woman (Jane) by a group of men. (*USC 2016, supra,* 246 Cal.App.4th at 224.) In its notice letter to John, SJACS listed USC Code sections that had allegedly been violated, without stating any factual basis for the alleged violations. (*USC 2016, supra,* at 225.) SJACS proceeded to inform John of the factual basis for the allegations -- but this factual basis differed from the factual basis for the sanction ultimately imposed. (*Ibid.*) Specifically, "[t]he SJACS investigation and report focused on alleged sexual assault and whether Jane consented to sexual contact. The Appeals Panel, on the other hand, suspended John for encouraging other students to slap Jane and for endangering Jane after all sexual contact had ended." (*Id.* at 225.) We concluded, "Because John was sanctioned based on activities that he was never informed might be the cause for sanctions, John was not provided with sufficient notice . . . ." (*Id.* at 244.) Here, *(Fn. is continued on the next page.)*

Second, Theta Xi received adequate opportunities to review and produce evidence.  Near the end of its investigation, but well before it issued its decision, SJACS allowed Casillas and attorney Hathaway to review the evidence it had gathered.  Casillas and Hathaway reviewed the evidence for 50 minutes, and nothing in the record indicates they requested additional time.  Soon thereafter, Casillas submitted various documents, which he characterized as "all the relevant information" Theta Xi wished to submit.[21]  Theta Xi's documentary submission included, inter alia, the questionnaires and transcripts collected in Theta Xi's internal investigation, and records of Schaar's disputes with Theta Xi and alleged transgressions against women.  SJACS addressed these matters in the SAR

there was no such bait and switch.  (See *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1016 [distinguishing *USC 2016*; college's adjudicator "did not engage in any 'bait and switch,'" but instead found accused student "had committed sexual misconduct as stated in the notice and nothing different"].)  As noted, the factual basis for the SJACS and SBAP decisions closely tracked Schaar's allegations, which SJACS had communicated to Theta Xi two days after sending its notice letter.

[21]  In support of its claim of bias, Theta Xi relies on Casillas's claim, in an email to Toghia, that SJACS Director Budar-Turner had denied him an opportunity to "tell [his] side of the story" during his initial SJACS interview.  However, Budar-Turner and Chavez Vargas's interview notes show that Casillas was allowed to provide exculpatory or mitigating statements (e.g., his denial that Theta Xi had held any "dirty" rush events), which Budar-Turner recorded.

report.  It reasonably deemed the Theta Xi members' internal interview responses not credible, particularly given the interview questions' narrow focus.  Contrary to Theta Xi's contention, SJACS was not required to interview each Theta Xi member the fraternity itself had interviewed. SJACS interviewed four of those witnesses -- viz., Casillas, Ortega, Weilbacker, and Eisenberg -- and reasonably found their statements corroborated Schaar's allegations in key respects.  In light of such corroboration, SJACS reasonably found Schaar generally credible, despite his potential motive to retaliate against Theta Xi for its role in their prior disputes.  Finally, SJACS reasonably deemed Schaar's alleged transgressions against women immaterial to the credibility of his allegations of misconduct among members of Theta Xi, an all-male fraternity.

Third, Theta Xi has failed to show even an appearance of bias, let alone actual bias or a high probability thereof. (See *Allee*, *supra*, 30 Cal.App.5th at 1060.)  Weighing against a finding that SJACS was biased against Theta Xi or in favor of Schaar, SJACS declined to credit Schaar's allegations in several respects.  Specifically, due to the absence of corroborating evidence, SJACS did not find true the allegations that (1) pledges had been required to participate in "fight night"; (2) pledges had been required to drink alcohol before their early-morning run; and (3) during the UCLA event, Theta Xi members had blindfolded pledges, required them to wear costumes or morph suits, and confiscated their wallets and phones.  Moreover, in part for

66

the reasons we have rejected Theta Xi's other procedural arguments, SJACS's procedures were not suggestive of bias. No bias was suggested by SJACS's refusal to allow Theta Xi member Weilbacker to be accompanied by an advisor during Weilbacker's interview. Theta Xi has neither claimed that USC's rules entitled Weilbacker to the presence of an advisor, nor identified evidence that SJACS allowed any third-party interviewee unaffiliated with Theta Xi to be accompanied by an advisor. Finally, no bias was suggested by SJACS's placing a hold on Theta Xi member Eisenberg's student records to induce his consent to an interview, despite SJACS's decision not to similarly induce an interview with Sarah Nuckel. Eisenberg and Nuckel were not similarly situated with respect to SJACS's investigation into hazing in and after fall 2016. Eisenberg had been a member of the fall 2016 pledge class, and Schaar had named Eisenberg as the pledge who had injured his knee during an alleged hazing activity. In contrast, Nuckel had never been a Theta Xi member. Though Schaar had submitted a written statement from Nuckel along with his complaint, Nuckel's statement concerned only Theta Xi's alleged "smear campaign" against Schaar, and said nothing about Schaar's allegations against Theta Xi. SJACS's decision to forego Nuckel's interview (after she failed to respond to its interview request) was reasonable and not suggestive of bias.

Finally, we reject Theta Xi's argument, based on our decision in *Allee, supra*, 30 Cal.App.5th 1036, that it was

entitled to heightened procedural safeguards, viz., (1) an opportunity to cross-examine witnesses; (2) separation of SJACS's investigative and adjudicatory functions; and (3) an administrative appellate procedure involving a more searching factual review than SBAP conducted. In *Allee*, as noted, we recognized that the common law right to a fair hearing typically does not require cross-examination or the separation of investigative and adjudicative functions. (See *id.* at 1061-1062, 1067.) On the record then before us, however, we held that a USC student accused of sexual assault and given no opportunity for cross-examination had been denied a fair administrative hearing, reasoning that (1) the student had been entitled to an opportunity for cross-examination, given the severity of the discipline he faced and the fact that the case turned on the credibility of the only two witnesses to the alleged assault, viz., the student and his alleged victim; and (2) the Title IX investigator had exercised her investigative discretion in "questionable" ways, as we deemed "virtually unavoidable" in a system entrusting her with combined investigative and adjudicative functions. (*Id.* at 1069-1071.) We did not hold that the student had been entitled to any particular administrative appellate procedure. Rather, we merely relied on limitations of the Title IX appellate procedure to support our holding that on the record before us, additional safeguards were required in the underlying factfinding process. (*Allee, supra,* at 1069.)

As the trial court aptly explained, *Allee* is distinguishable. "[H]ere, the severity of the sanction to any individual student directly is nonexistent; the investigation and subsequent proceeding only affected the rights of the fraternity, a private association, to participate as an on-campus organization."[22] "Also, unlike a sexual assault case, where the case often depends on the credibility of the only two people involved, the hazing case here had numerous potential witnesses; for example, [Theta Xi]'s own investigation into the allegations involved deposing fourteen witnesses. [Citation.] Further, SJACS relied on other corroborating evidence, such a text messages." Finally, although investigative and adjudicative functions were combined in SJACS, these functions were jointly exercised by two individuals (Budar-Turner and Chavez Vargas), and

---

[22] The nonexistence of any student discipline also distinguishes this case from *Knight v. South Orange Community College District* (Feb. 10, 2021, G058644) ___ Cal.App.5th ___ [2021 Cal.App. LEXIS 120] (*Knight*), decided the day this case was argued. There, the court held that a student reprimanded by a community college for physical harassment, but neither suspended nor expelled, received adequate notice of the allegations against him and an opportunity to respond. (*Id.* at *19-*30.) In dictum, the *Knight* court posited that had the student been suspended or expelled, he would have been entitled to "some form of hearing and witness confrontation . . . ." (*Id.* at *2.) Neither the *Knight* court's holding nor its dictum addressed the due process requirements applicable to student organizations. As we have explained, Theta Xi received adequate notice and opportunities to respond.

the record reveals no questionable exercises of their investigative discretion.  This record does not warrant the heightened procedural safeguards we found necessary on the record before us in *Allee*.  Instead, Theta Xi's procedural rights were governed by "General Principles of Fundamental Fairness," which, as we recognized in *Allee*, do not mandate cross-examination, separation of investigative and adjudicative functions, or any particular administrative appellate procedure.[23]  (*Allee*, at 1061-1062.)

In sum, Theta Xi has not shown that it was deprived of "adequate notice, a reasonable opportunity to respond, [or] a fair, unbiased decision-maker."  (CEB, Cal. Administrative Mandamus, *supra*, § 5.32.)  Nor has it shown that it was entitled to heightened procedural safeguards.  We conclude that Theta Xi received a fair administrative hearing.

---

[23]  Our Supreme Court is currently reviewing the following issue:  "Under what circumstances, if any, does the common law right to fair procedure require a private university to afford a student who is the subject of a disciplinary proceeding with the opportunity to utilize certain procedural processes, such as cross-examination of witnesses at a live hearing?"  (*Boermeester v. Carry* (2020) 49 Cal.App.5th 682, review granted and ordered not to be published September 16, 2020, S263180, Supreme Court Mins., Sept. 30, 2020.)  Pending guidance from our Supreme Court, we adhere to the views we have expressed here and in *Allee*.

**DISPOSITION**

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


MANELLA, P. J.

We concur:


WILLHITE, J.


CURREY, J.

**<u>CERTIFIED FOR PUBLICATION</u>**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| ALPHA NU ASSOCIATION OF THETA XI, <br><br>     Plaintiff and Appellant, <br><br>     v. <br><br> UNIVERSITY OF SOUTHERN CALIFORNIA et al., <br><br>     Defendants and Respondents. | B303269 <br><br> (Los Angeles County Super. Ct. No.18STCP02516) <br><br> ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed March 03, 2021 be modified as follows:

On page 8, line 3 of footnote 2, the phrase "Theta Xi member Derek Cheng" is deleted and replaced with the phrase "a fellow member";

On page 8, lines 4 through 5 of footnote 3, the phrase "Theta Xi member Anish Mahadeo" is deleted and replaced with the phrase "A fellow member";

1

On page 13, lines 8 through 9, the parenthetical "(Nikhil Cherukuri)" is deleted;

On page 13, line 19, the parenthetical "(Anish Mahadeo)" is deleted;

On page 14, lines 12 through 13, the phrase "fellow pledge Nikhil Cherukuri" is deleted and replaced with the phrase "a fellow pledge";

On page 17, line 3, the phrase "fellow pledge Matt Anderson" is deleted and replaced with the phrase "a fellow pledge";

On page 17, line 5, the phrase "fellow pledge Cherukuri" is deleted and replaced with the phrase "a fellow pledge";

On page 21, line 11, the name "Ladan" is deleted and replaced with the initial "L.";

On page 21, line 13, the name "Ladan" is deleted and replaced with the name "Chris";

On page 21, line 17, the name "Ladan" is deleted and replaced with the name "Chris";

On page 21, line 18, the possessive "Ladan's" is deleted and replaced with the word "His";

On page 21, line 21, the name "Ladan" is deleted and replaced with the word "he";

On page 34, line 19, the name "Ladan" is deleted and replaced with the initial "L.";

On page 35, line 5, the possessive "Chris Ladan's" is deleted and replaced with the possessive "Chris's";

On page 35, line 6, the name "Ladan" is deleted and replaced with the name "Chris";

On page 35, line 8, the possessive "Ladan's" is deleted and replaced with the word "his";

On page 38, line 13, the possessive "Chris Ladan's" is deleted and replaced with the possessive "Chris L.'s";

On page 38, line 14, the name "Ladan" is deleted and replaced with the name "Chris";

On page 49, line 2, the phrase "Fellow member Anish Mahadeo" is deleted and replaced with the phrase "A fellow member";

On page 50, line 7, the name "Ladan" is deleted and replaced with the initial "L.";

On page 51, line 17, the phrase "Theta Xi member Derek Cheng" is deleted and replaced with the phrase "a Theta Xi member";

On page 60, line 5, the possessive "Chris Ladan's" is deleted and replaced with the possessive "Chris L.'s";

On page 60, line 6, the name "Ladan" is deleted and replaced with the name "Chris";

On page 60, line 9, the possessive "Ladan's" is deleted and replaced with the word "his";

On page 71, line 4, the language "NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS" is deleted.

The opinion in the above-entitled matter was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be certified for publication in its entirety in the Official Reports and it is so ordered.

There is no change in judgment.

_____

MANELLA, P. J.          WILLHITE, J.          CURREY, J.

3